IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CR-151-TAV-DCP-10 |
| | ) | |
| JYSHON FORBES, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate.

This matter is before the Court upon Defendant Forbes' Motion to Suppress [Doc. 338], filed on February 11, 2021. The Government filed a response in opposition to the motion [Doc. 347] on February 25, 2021. An evidentiary hearing was held on Defendant Forbes' motion on April 2, 2021. [Doc. 351]. Assistant United States Attorney David Lewen appeared on behalf of the Government. Attorney Michael Cabage appeared on behalf of Defendant, who was present via videoconference. After hearing the arguments of counsel, the Court took the motion under advisement.

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's Motion to Suppress [Doc. 338] be denied.

# I.    POSITIONS OF THE PARTIES

This case arises out of the August 2, 2019 stop by the Tennessee Highway Patrol ("THP") of a silver Honda Accord driven by Defendant Forbes westbound on Interstate 40, as Defendant Forbes was traveling from Knoxville to Nashville, Tennessee.

Defendant Forbes is charged [Doc. 243] with the conspiracy to possess and distribute Schedule I, Schedule II, III and IV controlled substances, including 50 grams or more of methamphetamine, as well as a quantity of fentanyl, oxycodone, alprazolam, marijuana, buprenorphine, and heroin (Count One), in addition to money laundering (Count Three).

Defendant Forbes seeks [Doc. 338] to suppress and exclude all evidence and statements made as a result of the search and seizure of the vehicle he was driving on August 2, 2019. Defendant Forbes claims that law enforcement lacked probable cause to stop the vehicle, as well as that the search of the vehicle violated the Fourth Amendment.  First, Defendant Forbes asserts that the stop of his vehicle for following too closely was a pretextual stop based on information received from federal agents and their wiretap investigation.  Defendant Forbes maintains that he did not meaningfully violate Tenn. Code Ann. § 55-18-124(a)—the Tennessee statute for following too closely—as well as cites to *United States v. Barnes*, 19 F.3d 19 (Table), 1994 WL 75932, at *3 (6th Cir. 1994) to note the Sixth Circuit's concern with "the subjective rule of reason in Tennessee on following too closely" and direction that "the circumstances surrounding a stop for following too closely on an expressway within city limits should be examined carefully where there is a challenge based upon a pretextual stop."  [Doc. 338 at 3].  Lastly, Defendant Forbes claims that in addition to there not being probable cause to stop the vehicle, law enforcement impermissibly extended the time limit necessary to complete the stop and "tricked" him into giving consent to search his vehicle.  [*Id.*].

The Government responds [Doc. 347] that law enforcement had several independent bases justifying the initial stop of Defendant Forbes' vehicle. First, the Government maintains that THP Trooper Ryan Fletcher ("Trooper Fletcher") had probable cause to believe that Defendant Forbes had committed a traffic violation—following too closely—in violation of Tenn. Code Ann. § 55-8-124. Here, the Government asserts that the subjective intent of the officer is irrelevant, as well as that the traffic stop was not unconstitutionally prolonged by Trooper Fletcher's questioning, in part due to Defendant Forbes' increasing nervousness. Next, the Government alleges that due to the ongoing wiretap investigation and collective knowledge doctrine, the THP had probable cause to believe that Defendant Forbes and Codefendant Kedaris Gilmore were committing a felony and were in the possession of contraband. The Government maintains that Trooper Fletcher acted in objective reliance on what the FBI had advised the THP about the ongoing investigation, that the FBI possessed facts that supported probable cause that the vehicle contained contraband, and that the stop was no more intrusive that what would have been permitted for the requesting officer. Third, the Government asserts that the THP knew that Codefendant Gilmore, an occupant of the vehicle, had an outstanding warrant for his arrest for a probation violation.

The Government further claims that the THP had several independent bases to justify the search of Defendant Forbes' vehicle. First, the Government asserts that due to the collective knowledge doctrine, the THP had probable cause to believe that the vehicle contained contraband and could be searched without a warrant. Moreover, the Government claims that Defendant Forbes, although handcuffed, provided knowing and voluntary consent to search his vehicle, as well as that under the inevitable discovery doctrine, the vehicle would have been searched pursuant to an authorized THP inventory search. The Government also addresses Defendant Forbes' statements made to law enforcement, and claims that it will not use statements made when

3

Defendant Forbes was not given a *Miranda* warning while handcuffed, but that his spontaneous utterances about the amount of money in the vehicle and his interest in it are admissible because they were not made in response to any interrogation. Lastly, the Government claims that suppression is not warranted under the good faith exception set forth in *United States v. Herring*, 555 U.S. 135, 141 (2009).

## II.    SUMMARY OF TESTIMONY

At the April 2 hearing, the Government presented the testimony of FBI Agent Christopher Slone ("Agent Slone") and THP Trooper Fletcher. Defendant Forbes presented no witnesses. The Government introduced the exterior video from Trooper Fletcher's dash cam as Exhibit 1; the interior video of Trooper Fletcher's dash cam as Exhibit 2; a photograph of the inside of Defendant's vehicle as Exhibit 3; a photograph of the inside of the dog food bag found in Defendant's vehicle as Exhibit 4; a photograph of the U.S. currency found within the dog food bag as Exhibit 5; and a Tennessee Electronic Crime Report as Exhibit 6. The Court summarizes the witnesses' testimony and exhibits as follows.

The Government first presented the testimony of Agent Slone, who stated that he has worked for the FBI for approximately nine years and currently serves in the High Intensity Drug Trafficking Unit. Agent Slone detailed that on August 1 and 2, 2019, he was involved in an ongoing wiretap investigation into the distribution of drugs by the Vice Lords gang, including Defendant Forbes and Codefendants Gilmore and Ushery Stewart. Agent Slone stated that based upon the intercepted communications, law enforcement knew that Codefendants Stewart and Gilmore were attempting to procure money by collecting drug proceeds in excess of $14,000 to meet with their source of supply in Nashville and obtain what was believed to be crystal methamphetamine. Agent Slone detailed that Codefendants Gilmore and Stewart had several

phone conversations regarding where the money was coming from, how much they had currently collected, and how much they could gather within the next two days. Additionally, Agent Slone testified that Codefendants Gilmore and Stewart made plans to meet on Watt Road.

Next, Agent Slone stated that law enforcement knew that Defendant Gilmore would be in a borrowed, silver Honda Accord ("the Honda"), as well as that based on the wire interception, Codefendant Gilmore did not want to drive his personal vehicle (a maroon Chevy) because it had drive-out tags and dark tint. Here, Agent Slone testified that individuals that are partaking in the distribution of illegal narcotics believe that tinted windows and drive-out tags are an attraction to law enforcement. Agent Slone also stated that Codefendant Gilmore mentioned dog food on the intercepted conversations.

Agent Slone then testified that Codefendants Gilmore and Stewart were physically observed by law enforcement meeting at the TA truck stop off of Watt Road. During this meeting, law enforcement observed the Honda exit Interstate 40 at Watt Road and turn into the TA truck stop. Codefendant Stewart then exited his vehicle, walked to the Honda, entered the vehicle, and moments later exited the Honda and returned to the vehicle he arrived in. At this time, the FBI had learned that Codefendant Gilmore had an active violation of his probation for carjacking.

After the Honda drove off, Agent Slone stated that the FBI was in communication with the THP to assist in interdiction—making a stop of the vehicle which was believed to be carrying drug proceeds. Agent Slone testified that the THP was made aware of the FBI investigation involving the Vice Lords, and that the FBI requested the THP to stop the vehicle because of the contents believed to be inside of the vehicle and the outstanding warrant for Codefendant Gilmore's arrest based upon his probation violation. Agent Slone stated that this information was communicated to the THP.

On cross-examination, Agent Slone stated that communications were intercepted that described the Honda, and that there was approximately twenty-four hours from when the intercepted conversations started talking about the trip to Nashville until when the vehicle was stopped. However, Agent Slone testified that law enforcement knew that Codefendant Gilmore was borrowing a vehicle, but that they did not know exactly what type of vehicle until Codefendant Gilmore was observed in the Honda. Agent Slone stated that the FBI informed the THP of their belief that there were drug proceeds in the vehicle driving to Nashville.

When asked about the FBI's instructions to the THP, Agent Slone testified that he was not in direct communication with the THP, but his recollection was that an interdiction stop on the vehicle was requested, and communication was maintained to describe the vehicle, its occupants, and its location as it was progressing towards Nashville. When asked about the process of obtaining a search warrant, Agent Slone stated it was within the realm of possibility that he could have obtained a search warrant for the vehicle within twenty-four hours; however, he also testified that it would have been very difficult to obtain a search warrant for a specific location because law enforcement was not aware of the specific vehicle Defendant Forbes and Codefendant Gilmore were driving.

On redirect examination, Agent Slone stated that Codefendant Gilmore was intercepted talking about having too much tint and drive-out tags on his own vehicle. Additionally, Agent Slone testified that the vehicle was actively traveling, and in order to obtain a search warrant, the place to be searched has to be located in the district that the magistrate judge has jurisdiction over. Agent Slone further stated that the FBI had probable cause to believe that the vehicle had drug proceeds and a person with an active BOP warrant inside of it.

6

On recross examination, Agent Slone stated that it was possible that the vehicle at issue was within the Eastern District of Tennessee during the twenty-four-hour period. Additionally, Agent Slone testified that there was not a wiretap on Defendant Forbes' phone during this period, and that while there might have been a call involving Defendant Forbes, Codefendants Gilmore and Stewart were the prime actors in the intercepted conversations.

The Government then presented the testimony of Trooper Fletcher, who testified that he has worked for the THP for approximately five years. Trooper Fletcher described his general duties as traffic enforcement on local and interstate roadways, as well as criminal interdiction and investigations into crashes. Next, Trooper Fletcher stated that on August 2, 2019, he assisted the FBI by effecting a traffic stop on westbound Interstate 40 of the Honda that was occupied by Defendant Forbes and Codefendant Gilmore. Trooper Fletcher testified that he was informed by his sergeant that he would be assisting the FBI on a traffic stop of a vehicle that contained two individuals that were a part of the Vice Lords and were transporting illegal proceeds from drug trafficking.

Next, Trooper Fletcher stated that he was advised that both individuals were considered to be armed and dangerous, as well as that the passenger had an active violation of probation warrant for what was believed to be aggravated assault and carjacking. Trooper Fletcher clarified that Defendant Forbes was the driver of the Honda, Codefendant Gilmore was the passenger in the vehicle, as well as that he had heightened awareness due to the potential that the occupants were armed and dangerous.

Trooper Fletcher stated that he did not immediately pull the Honda over when he saw it on the interstate, as he observed the vehicle go by him and subsequently observed a traffic violation. Trooper Fletcher detailed that he followed the vehicle to allow the violation to be captured on his

7

dash cam and then effected a traffic stop. When questioned about the traffic violation, Trooper Fletcher stated that the vehicle was following too closely, in violation of Tenn. Code Ann. § 55-8-124. Trooper Fletcher detailed the nature and scope of the recording capabilities of his police vehicle, stating that it has a dash camera that faces outward to capture violations or anything occurring outside of the vehicle, as well as an interior camera which records all actions inside of the vehicle. The Government then introduced as Exhibits 1 and 2 the recording of the exterior dash cam (Exhibit 1) and the interior dash cam (Exhibit 2).

Trooper Fletcher testified that he effectuated the traffic stop on Interstate 40 westbound within Roane County, and while he could not recall the exact mile marker, it was on an incline heading up the mountain. Trooper Fletcher stated that he was familiar with this stretch of the highway, as it has been designated as an area of concern by the THP because of the heavy traffic and large number of crashes, which have resulted in several fatalities. When asked about what the THP considers in evaluating whether an individual is following too closely on the interstate, Trooper Fletcher testified that the THP refers to the Tennessee Driver's Handbook and the two methods that one can use to figure out if they are following too closely. The first method would be providing at least one car length per ten miles per hour, as Trooper Fletcher stated that if an individual is traveling at sixty miles per hour, then they should estimate a six-car-length distance between them and the vehicle in front of them. Additionally, Trooper Fletcher testified that the second method would be providing a minimum of a four-second time frame on the interstate between vehicles, with an individual being able to pick a landmark in front of them, and as the car in front of them passes that landmark, count until they reach the landmark. Trooper Fletcher categorized the two standards as car lengths or seconds and stated that weather affects the analysis of whether someone is following too closely.

Next, Trooper Fletcher testified that on August 2, 2019, the weather was clear and sunny, but that there were multiple construction advisories on the applicable stretch of the interstate. In particular, Trooper Fletcher stated that going up the incline, there were orange and white traffic barrels originally on the left side of the interstate and then switching to the right side at certain times, as well as being on both sides at certain times. Further, Trooper Fletcher testified that there were bright orange signs indicating uneven lanes. Trooper Fletcher stated that these advisories, as well as uneven lanes and road signs, would instruct drivers to drive with more care and allow an increased reaction time and following distance.

When discussing the August 2, 2019 traffic stop, Trooper Fletcher detailed that his vehicle was traveling approximately 60 miles per hour and that he was "maintaining a consistent speed as to…the Honda"; therefore, the Honda was also traveling approximately 60 miles per hour. Trooper Fletcher testified that on the day of the traffic stop, given the speed and road conditions, the Honda should have kept a six-car-length distance with the car in front of it. However, Trooper Fletcher stated that the Honda did not have a six-car-length distance or maintain a six-second elapsed duration from the vehicle in front of it when passing a landmark. Trooper Fletcher testified that after he witnessed the Honda following too closely and captured the violation on video, he moved into the right lane and initiated his emergency lights to initiate a traffic stop.

Trooper Fletcher detailed that he issued a citation to Defendant Forbes for following too closely, in violation of Tenn. Code Ann. § 55-8-124. The Government introduced as Exhibit 6 the report compiled by Trooper Fletcher and the citations issued to Defendant Forbes. Trooper Fletcher stated that he compiled the narrative section of the report, as well as that he also issued a citation for a violation of Tenn. Code Ann. § 55-50-601, a driver's license violation for possession of a suspended driver's license, and for a violation of Tenn. Code Ann. § 55-50-504, driving while

9

on a suspended license, which is an arrestable offense. Trooper Fletcher testified that in the narrative of this document, he noted that Defendant Forbes was traveling at an unsafe distance.

The Government then reviewed the dash cam footage previously introduced as Exhibit 1 with Trooper Fletcher. Trooper Fletcher described the footage as capturing Interstate 40 westbound, with the above-described incline and traffic barrels indicating a construction area. Trooper Fletcher identified the signs signaling the uneven lanes on both sides of the roadway and additional traffic construction barrels. At this point, Trooper Fletcher detailed that the distance between the two vehicles (the Honda and the vehicle in front of it) continued to decrease as opposed to increase despite the cautions listed. Trooper Fletcher reviewed a third set of warning signs on the video, as well as repeated that the particular stretch of interstate was designated an area of concern by the THP. Trooper Fletcher described the roadway as an incline with multiple signs, and other vehicles that were almost within striking distance of each other.

At this point, Trooper Fletcher reviewed the video footage of the traffic stop of the Honda. Trooper Fletcher stated that Defendant Forbes was the driver of the vehicle and Codefendant Gilmore was in the front passenger seat. Trooper Fletcher testified that he made eye contact with both individuals, began speaking with Defendant Forbes about the violations, and as he started speaking with Defendant Forbes, Defendant Forbes started to open the driver's side door and placed his left leg out of the vehicle as if he was going to step out. Trooper Fletcher then asked Defendant Forbes, "Are you wanting to get out," or something to the effect of him making the move, and he thought that Defendant Forbes' actions were odd. Additionally, Trooper Fletcher stated that the passenger, Codefendant Gilmore, was seated flat in the seat, looking directly forward. When reviewing additional video footage, Trooper Fletcher detailed that he stated "You're wanting to step out," because of Defendant Forbes' attempt to remove his shoulder from

the seat and his leg was starting to go towards stepping out of the vehicle—which is not common until law enforcement requests an individual to step out of the vehicle.

Trooper Fletcher explained that at this time, he had only began telling the occupants of the vehicle the purpose for the stop and what documents he needed, so it seemed odd that Defendant Forbes was attempting to get out of the vehicle. Moreover, Trooper Fletcher testified that this action was drastically increasing his suspicion, given the way that the passenger was straightforward and hardly acknowledging him, as well as that the driver was attempting to remove himself from the situation.

After reviewing additional video footage, Trooper Fletcher stated that he patted Defendant Forbes down after asking him to exit the vehicle due to the previously-provided information that the occupants of the vehicle were considered to be armed and dangerous, as well as their increased level of nervousness despite Trooper Fletcher's consistent statement that his goal was to solely provide a warning or citation. Trooper Fletcher detailed that Defendant Forbes was sweating profusely, so when he asked Defendant Forbes to step out of the vehicle, he wanted to make sure that Defendant Forbes did not have anything in his pockets.

Trooper Fletcher then reviewed the interior dash cam footage, by first noting that Defendant Forbes was sweating profusely. Trooper Fletcher acknowledged that it was hot that day, but that the profuse sweating, in connection with the immediate desire to step out of the vehicle and Codefendant Gilmore's straightforward look, resulted in an increased suspicion. Trooper Fletcher stated that if any of these suspicions decrease, then it does not continue to be a concern. Trooper Fletcher testified that he continued to state that he would offer a warning or citation, but that Defendant Forbes' emotions continued to rise.

11

Trooper Fletcher stated that Defendant Forbes was not handcuffed when sitting in the front passenger seat of the police cruiser. Trooper Fletcher detailed that he noticed Defendant Forbes' sweating, as well as his extremely dry mouth. Trooper Fletcher testified that after Defendant Forbes sat in the front passenger seat of the police cruiser, his suspicion that that criminal activity was afoot certainly increased based on Defendant Forbes' actions, in part because Defendant Forbes started making a clicking noise.[1] Additionally, Trooper Fletcher stated that Defendant Forbes responded to questioning with convincing statements, such as "I promise you, I'm telling you the truth, I'm not lying." Trooper Fletcher testified that the fact that Defendant Forbes provided nicknames and acted as if he did not know the name of the person with whom he was traveling continued to increase his suspicion.

Trooper Fletcher also stated that Defendant Forbes exhibited physical distancing such as when Defendant turned his shoulder away stepping out of the vehicle, as well as distancing in the conversation. Trooper Fletcher detailed that during this time, he was waiting for returns from dispatch and asking Defendant Forbes about his itinerary and who he was traveling with, but Defendant Forbes was having a difficult time giving him direct answers, especially on who was with him in the vehicle. Trooper Fletcher stated that Defendant originally provided him with a lot of information, and then failed to provide a direct answer of who was in the vehicle with him. Additionally, Trooper Fletcher testified that during this time he was typing into his computer and was receiving and reading returns. While reviewing video of him questioning Defendant Forbes about his plans to travel to Nashville, Trooper Fletcher testified that Defendant Forbes' response

---

[1] The Government played an excerpt of the exterior video recording after which Trooper Fletcher characterized Defendant Forbes as making a "clicking" noise prior to speaking due to his extremely dry mouth, which was also exhibited through white corners of the mouth.

that he was going to visit his son, but changing his answer on whether he was staying the night, increased his concern because of Defendant Forbes' inability to commit to answers.

Trooper Fletcher was then played a portion of the dash cam footage of him questioning Defendant Forbes about how to spell Defendant Gilmore's name, to which Defendant Forbes stated that he did not know. Trooper Fletcher then testified that at this point, his sergeant showed up to assist, and he was waiting for his sergeant to arrive to speak with Codefendant Gilmore, who remained in the Honda. Trooper Fletcher stated that at no point did he or the other trooper pull their guns or threaten Defendant Forbes or Codefendant Gilmore. Trooper Fletcher stated that he attempted to comfort Defendant Forbes by making sure the air was on in the police cruiser and asking if he was okay throughout the stop. Additionally, Trooper Fletcher testified that once Defendant Forbes was seated in the rear of the police cruiser, he was drenched in sweat and had removed his glasses while wiping off his face. Trooper Fletcher stated that he obtained a towel, wiped Defendant Forbes' face off, placed his glasses back on, and put his handcuffs in the front.

Trooper Fletcher testified that during the traffic stop, he learned that Defendant Forbes was twenty-five years old; that Defendant Forbes stated that he had just had a son a few months ago and was on his way to see his son; that he had went through elementary, middle, and high school with Codefendant Gilmore; that he had worked for Coca-Cola and possessed a commercial vehicle license; and he was currently working for University of Tennessee Housing. Trooper Fletcher testified that while Defendant Forbes was in the police cruiser, he was looking up his ability to operate a vehicle and learned that Defendant Forbes had a suspended license out of Davidson County in reference to a failure to appear. Additionally, Trooper Fletcher stated that Defendant Forbes informed him that his brother had been shot in Davidson County.

Case 3:19-cr-00151-TAV-DCP    Document 384    Filed 05/14/21    Page 13 of 61
PageID #: 3087

Trooper Fletcher testified that it appeared to him that Defendant Forbes understood him when he was speaking with him; that Defendant Forbes was not read his *Miranda* warnings while in custody; and that there was a point during the traffic stop when he sought consent to search the Honda. The Government played a portion of Exhibit 1 where Defendant Forbes was handcuffed in the rear of the patrol vehicle. Trooper Fletcher stated that at this time he had prior knowledge that Codefendant Gilmore had an active probation violation out of Knox County, had received a physical response of this information, and he had placed Codefendant Gilmore under arrest for the violation of his probation. Trooper Fletcher testified that the evasive answers provided by Defendant Forbes prolonged the furtherance of the stop. Trooper Fletcher reviewed video of him arresting Codefendant Gilmore and asking his sergeant to get Defendant Forbes out of the back of his patrol vehicle.

Next, Trooper Fletcher reviewed a portion of the dash cam footage and testified that although a truck was heard driving by as he was questioning Defendant Forbes, he asked Defendant Forbes if he could search the vehicle, as well as the contents, containers, and anything suspicious therein. Trooper Fletcher agreed that this conversation was transcribed in Doc. 347-1 starting on line 379. The Government reviewed the transcription where Trooper Fletcher stated: "All right. Do you give me consent to search the vehicle, contents, containers and anything suspicious therein," to which Defendant Forbes responds, "No, sir." Trooper Fletcher responded: "You don't give me permission?"—to which Defendant Forbes said "Yes, yeah."

Trooper Fletcher testified that it was his understanding, based on his dialogue and experience at the traffic stop, that Defendant Forbes was giving him consent to search the Honda based on the form of the question involving anything suspicious, to which Defendant Forbes responded "no." Additionally, Trooper Fletcher stated that he understood Defendant Forbes'

14

response of "Yes, yes sir. All I've got is a lot of money in there" to his question of "You don't give me consent" to mean that Defendant Forbes was stating that there was not anything illegal in the vehicle but that he could search it. Trooper Fletcher also stated that throughout his conversation with Defendant Forbes, there was at least one other time where Defendant Forbes gave an answer that he tried to clarify, and it turned out to be the other way. Trooper Fletcher testified that the inability to get clear, concise answers led him to make sure that he understood what Defendant Forbes' answer was. Similarly, Trooper Fletcher stated that it was his understanding that Defendant Forbes gave knowing and voluntary consent to search the vehicle. Also, when reviewing the Government's transcript, Trooper Fletcher testified that when Defendant Forbes later volunteers "I got nothing but a lot of money in there," he did not ask Defendant Forbes any prior questions.

Trooper Fletcher detailed that he searched the vehicle pursuant to Defendant Forbes' consent, as well as that THP policy states that when both occupants of a vehicle are under arrest, and the vehicle cannot be driven away, the vehicle is towed off of the interstate. Trooper Fletcher testified that he arranged for the Honda to be towed off of the interstate, and that the inventory search policy is to ensure that all property within the vehicle, locked or unlocked, is documented and secure to protect the officers from liability, as well as the owner and their property and the safekeeping of the vehicle. Trooper Fletcher stated that the THP documents the items of value in the vehicle, and that even if Defendant Forbes had not given consent, the Honda would have been searched pursuant to the THP inventory policy.

The Government then introduced as Exhibits 3, 4, and 5 pictures that Trooper Fletcher took of the search of the Honda. Trooper Fletcher testified that Exhibit 3 was the inside of the front of the Honda, including the dog food bag in the passenger floorboard that was in-between

15

Codefendant Gilmore's legs. Trooper Fletcher stated that upon closer observation, there was a distinct odor of Super Glue. When discussing Exhibit 4, Trooper Fletcher testified that he observed that the bag was not full of dog food, which was suspicious because it was not an unopened bag. Next, Trooper Fletcher stated that after opening the dog food bag, he observed a clear grocery bag and what appeared to be U.S. currency. While reviewing Exhibit 5, Trooper Fletcher stated that this picture depicted the bundle of U.S. currency that was removed from inside of the dog food bag.

Trooper Fletcher stated that Defendant Forbes then made a subsequent volunteered statement while he was in back of the police cruiser regarding the found money. After reviewing the portion of the dash cam video, Trooper Fletcher detailed that Codefendant Forbes was in the back seat of the police cruiser and asked "Did you all count that money," and after Trooper Fletcher explained the procedure, Defendant Forbes stated that "that's fourteen one-thirty to be exact." However, Trooper Fletcher stated that Defendant Forbes was a thousand dollars off, and $13,130 was recovered.

On cross examination, Trooper Fletcher testified that the FBI contacted his sergeant, but his understanding was that the THP was going to be assisting in a federal investigation involving two Vice Lord gang members transporting a large amount of U.S. currency, that they were believed to be armed and dangerous, and that the passenger had an active violation of probation for carjacking and aggravated assault. Additionally, Trooper Fletcher stated that he was told the vehicle these individuals would be driving, the direction of their travel, and that there would be surveillance involved. Trooper Fletcher detailed that the THP had the names of the individuals involved, but that he was not sure if he or his sergeant ran their criminal history, or if their criminal history was specifically told to him. Trooper Fletcher testified that he ran Defendant Forbes and

Codefendant Gilmore's driving history while he was sitting in his patrol vehicle after the stop. Trooper Fletcher also stated that he performed a NCIC check on Codefendant Gilmore for the probation violation, as well as that these checks are performed on all traffic stops.

When asked about the vehicle that the Honda was following, Trooper Fletcher stated that it was probably true that the vehicle the Honda was following was actually closer to the car in front of it than the Honda was to that vehicle. Trooper Fletcher provided his estimation that there was three to four car lengths distance between the Honda and the vehicle in front of it. Trooper Fletcher testified that it was not uncommon for vehicles on the particular stretch of the interstate to be travelling three or four car lengths at approximately the speed of the Honda.

Next, Trooper Fletcher stated that pretty much everyone is nervous when getting pulled over by a police officer, and that it would be fair to say that different cultures or ethnic groups would respond differently to law enforcement. Additionally, Trooper Fletcher testified that it was hot on the date in question, that he was sweating at some point, and that he wiped his head with a towel after completing the search of Defendant Forbes' vehicle. Trooper Fletcher clarified that after the traffic stop, he checked Defendant Forbes' driving history and the information for the NCIC return for the vehicle.

Trooper Fletcher testified that he ultimately asked Defendant Forbes to step out of the Honda. Trooper Fletcher detailed that it was a common practice for him to ask the driver to sit in the passenger seat of his patrol vehicle regardless of the nature of the stop or if he had prior information. Trooper Fletcher stated that it was common practice to ask lots of questions of an individual stopped for following too closely, that Defendant Forbes was not free to go when he was sitting in the front seat of the patrol vehicle, and that he was not free to leave when he was put in handcuffs and placed in the back of the patrol vehicle. Trooper Fletcher repeated that he did

not ever read Defendant Forbes his *Miranda* rights. Trooper Fletcher then again reviewed the transcript of the alleged consent provided by Defendant Forbes, as well as stated his belief that Defendant Forbes' response provided consent to search the vehicle. Trooper Fletcher stated that he did not recall how long he followed the Honda before initiating the traffic stop.

On redirect examination, Trooper Fletcher stated that when Defendant Forbes was in the front passenger seat of his patrol vehicle, he was detained; however, he was under formal arrest when he was placed in handcuffs.

## III.    FACTUAL FINDINGS

The following factual findings are taken from the testimony and exhibits at the suppression hearing, as well as Trooper Fletcher's dash cam video recordings made at the time of the stop.

On August 1, 2019, the FBI was involved in an ongoing wiretap investigation into the distribution of drugs by the Vice Lords gang. The FBI intercepted conversations between Codefendants Gilmore and Stewart detailing their attempts to collect drug proceeds in order to meet with a source of supply in Nashville, Tennessee. Codefendants Gilmore and Stewart were intercepted discussing plans to meet on Watt Road.

On August 2, 2019, the FBI contacted the THP for assistance in effecting a traffic stop on westbound Interstate 40 of the Honda that would be occupied by Defendant Forbes and Codefendant Gilmore. The THP was informed that the vehicle contained two individuals that were a part of the Vice Lords gang and were transporting illegal proceeds from drug trafficking. Later that day, law enforcement observed Codefendants Gilmore and Stewart meeting at the TA truck stop off of Watt Road. Defendant Forbes was driving the Honda, with Codefendant Gilmore in the front passenger seat. Codefendant Stewart exited his vehicle, walked to the Honda, entered and exited the Honda, and then returned to the vehicle he had arrived in.

18

Subsequently, the Honda driven by Defendant Forbes left the truck stop, entered Interstate 40 westbound, and was later observed by Trooper Fletcher. Trooper Fletcher enters the roadway, and, with his exterior camera activated, proceeds to follow the Honda. Trooper Fletcher continues to drive in the left lane, with the Honda in the right lane with several vehicles in front of it. There are several orange traffic barrels originally on the right side of the Interstate, orange caution signs, and then orange traffic barrels on the left side of the Interstate.

The audio of the exterior dash cam recording (Exhibit 1) turns on at approximately 20:02:06 of the video recording.[2] Trooper Fletcher continues to observe the Honda in the right lane, and at approximately 20:02:40 turns into the right lane behind the Honda. Trooper Fletcher continues to follow the Honda, and the vehicle begins to pull over to the right shoulder of the interstate beginning at 20:02:53.[3] Trooper Fletcher radios his position, stating that he believes that he was just before Exit 340, and informs dispatch of the Honda's license plate. Trooper Fletcher then exits his vehicle and approaches the passenger side of the vehicle at approximately 20:03:50.

At this point, Trooper Fletcher introduces himself and informs Defendant Forbes and Codefendant Gilmore that he had stopped the vehicle for following too closely. Trooper Fletcher states that he is not planning on writing a ticket, but instead would issue a warning, and asks Defendant Forbes for his license and the vehicle's registration. Trooper Fletcher observed Defendant Forbes open the driver's side door of the Honda and place his left leg out of the vehicle. At approximately 20:04:14 of the video recording, Trooper Fletcher asks Defendant Forbes if he

---

[2] Due to the use of both the interior and exterior dash cam recordings, the Court will refer to the time stamp in the upper-right corner of the recordings. For reference, Trooper Fletcher is overheard on video stating that it is 5:28 p.m. while informing Defendant Forbes that he was signing a release form for the seized money to the THP—approximately one hour and twenty-three minutes from initially approaching the Honda.

[3] It is unclear on the video recording when Trooper Fletcher activated his blue lights to stop the Honda.

19

would like to get out of the vehicle, as well as that he could do that once he provided his license and registration. Trooper Fletcher then collects the license and registration, and at approximately 20:04:36 on the video recording, asks Defendant Forbes why he was wanting to step out of the vehicle. During this time, Codefendant Gilmore was looking directly forward and not making eye-contact with Trooper Fletcher.

At approximately 20:04:53, Trooper Fletcher directs Defendant Forbes to exit the Honda and asks whether he has a valid driver's license. Defendant Forbes then exits the vehicle, is patted down by Trooper Fletcher, and sits in the front passenger seat of the patrol vehicle at approximately 20:05:26 on the video recording. Trooper Fletcher is heard stating that he would turn the air conditioning on in the vehicle and commenting that Defendant Forbes was sweating at approximately 20:05:33.[4]

Trooper Fletcher asks Defendant Forbes if "everything is good with his license," notes that Defendant Forbes has a commercial license, and asks him what company he drives for. Trooper Fletcher asks Defendant Forbes if he is alright and notes that he seems "awfully tore up." Defendant Forbes states that he was driving down to Nashville, that his "old lady just had a baby," and that he had not seen his one-year-old since April. Defendant Forbes then states that his brother had been killed in Nashville on January 22nd from a gunshot wound. When asked who was in the car with him, Defendant Forbes states "that's my friend." Trooper Fletcher asked what the passenger's name was at approximately 20:06:26 on the video recording, and Defendant Forbes responds "Uhhh, KD. That's what they call him." Trooper Fletcher again asks what his name is, while reiterating to Defendant Forbes that he was not in trouble, to which Defendant Forbes responds, "his name is Kedaris" and that he grew up with him.

---

[4] The audio recording of the interior dash cam begins at approximately the same time.

At approximately 20:06:49, Trooper Fletcher states "I gotta ask man, is there somethin' goin' on that I need to know about," to which Defendant Forbes responds "no, sir." Defendant Forbes states that he was trying to get to Nashville because he had not seen his son in four months and adds "she just put me on child support," as well as that "she just had another baby." Trooper Fletcher asks Defendant Forbes why Codefendant Gilmore was going with him, to which Defendant Forbes responds that Codefendant Gilmore was his childhood friend, and that he and Codefendant Gilmore went to elementary, middle, and high school together.

Several beeps are then heard in the patrol vehicle, and Trooper Fletcher asks Defendant Forbes whose vehicle he was driving at approximately 20:07:24. Defendant Forbes responds that it was his "childhood friend, her name is, uh, Tadaja." During this time, Trooper Fletcher continues to type into his computer and receive additional information. Trooper Fletcher then asks Defendant Forbes how long he was going to be in Nashville, to which Defendant Forbes responds, "I'm in and out," and that "I'll be gone tomorrow." After Trooper Fletcher questions whether he was going to stay the night, Defendant Forbes states that he was going to stay, that he was leaving in the morning, and that he was staying at his "old lady's house." While continuing to type on his computer, Trooper Fletcher then asks "what's his last name," to which Defendant Forbes responds "I believe it's Gilmore" at approximately 20:08:17. Defendant states that he was just trying to see his son, and that he had just gotten off of work from University Housing.

At approximately 20:08:56, another THP trooper arrives at the scene, and Trooper Fletcher states "he's just real nervous, if you'll just watch the passenger for a minute." Defendant Forbes responds that he did not have anything to lie about and repeats the address where he was traveling. Trooper Fletcher then states that he was thinking of how to look up Codefendant Gilmore if he did

not know how to spell his first name. Then, in response to questioning, Defendant Forbes states that there was nothing in the car or any weapons that Trooper Fletcher needed to be worried about.

Trooper Fletcher communicates with dispatch beginning at approximately 20:09:38, and Defendant Forbes states that he did know that he was following the car too closely. Trooper Fletcher responds that Defendant Forbes was originally fine in the left lane when no one was in front of him, but once he got over into the right lane, he kept inching closer and closer to the vehicle in front of him. After Defendant Forbes asks, "I was 100 feet in front of him, wasn't I?," Trooper Fletcher responds that it should be one car length per ten miles an hour, and that because Defendant Forbes was traveling sixty-miles per hour it should be six car lengths, but he was about three from the vehicle in front of him. Trooper Fletcher reiterates that he was not going to give him a ticket and asks whether there was insurance on the vehicle. Defendant Forbes responds that "she just said her car was in her registered name," and Trooper Fletcher continues typing on his computer. At approximately 20:10:47, Trooper Fletcher shows Defendant Forbes that the computer indicated that the insurance status was unconfirmed.

Next, after receiving additional information from dispatch, at approximately 20:11:05, Trooper Fletcher states that his computer was showing that Defendant Forbes had a suspended license. Defendant Forbes responds that he had "just paid them" and that his license was originally suspended in Davidson County. Trooper Fletcher confirms that the license is suspended and at approximately 20:11:30, asks Defendant Forbes to step outside to the front of his vehicle. Defendant Forbes exits the patrol vehicle while Trooper Fletcher continues to communicate with dispatch about Defendant Forbes' driver's license. At approximately 20:12:17, Trooper Fletcher exits the patrol vehicle and informs Defendant Forbes that until he figures out why Defendant Forbes' driver's license was suspended, he would place Defendant Forbes in the back of his patrol

22

vehicle.  Trooper Fletcher then informs Defendant Forbes that he was not under arrest but being detained and places him in handcuffs.  Trooper Fletcher speaks with the other THP officer, states that Defendant Forbes has a suspended license, and asks the other officer to see whether Codefendant Gilmore has a license.

Defendant Forbes is then placed in the back seat of the patrol vehicle at approximately 20:13:17.  Outside of the vehicle, Trooper Fletcher communicates with the other officer, who informs him that Codefendant Gilmore stated that he has never had a license.  Trooper Fletcher then tells the other officer that he had detained Defendant Forbes until he received the "for sure" status of Defendant Forbes' license, and if "everything was good," he would "get him [Codefendant Forbes] out of there."  Trooper Fletcher re-enters the patrol vehicle at approximately 20:13:41.   Defendant Forbes then asks Trooper Fletcher to turn on the air conditioning and Trooper Fletcher informs him that Codefendant Gilmore did not have a license.  Trooper Fletcher radios dispatch and requests for them to check on an additional number at approximately 20:16:17.  During this time period, Trooper Fletcher continues to communicate with Defendant Forbes about the air conditioning in the vehicle.  In particular, at approximately 20:18:11, Trooper Fletcher retrieves a white towel and wipes Defendant Forbes' face while he was handcuffed.

Dispatch then informs Trooper Fletcher that Codefendant Gilmore had a warrant out of Knox County, capias, for aggravated robbery and carjacking, and no bond, at approximately 20:19:23.  Trooper Fletcher exits the patrol vehicle, approaches the Honda, and asks Codefendant Gilmore to step out of the vehicle and place his hands behind his back.  Trooper Fletcher states that Codefendant Gilmore has a warrant in his name out of Knox County, places handcuffs on Codefendant Gilmore, and searches Codefendant Gilmore to make sure he did not have any weapons.  Trooper Fletcher then asks the other officer to remove Defendant Forbes from the back

of the patrol vehicle, and Defendant Forbes exits the patrol vehicle at approximately 20:21:13. Codefendant Gilmore is then placed in the backseat of the patrol vehicle.

Trooper Fletcher and the other officer briefly speak to Defendant Forbes behind the patrol vehicle, take his handcuffs off, and move them to the front of his body. Trooper Fletcher asks Defendant Forbes at approximately 20:21:59 if there is "anything illegal in that car I need to know about," to which Defendant Forbes responds, "No, sir." Trooper Fletcher then asks, "Do you give me consent to search the vehicle, contents, containers, anything suspicious therein," to which Defendant Forbes responds, "No, sir." After Trooper Fletcher states, "You don't give me permission," Defendant Forbes responds, "Yes, yeah." Defendant Forbes then states, "I got nothin' but a lot of money in there." Trooper Fletcher asks how much money, to which Defendant Forbes responds that "it's $14,000" and he was behind on his child support and taking it to "her."[5] Trooper Fletcher asks Defendant Forbes where the money was, to which Defendant Forbes responds that it is in a bag. Trooper Fletcher then questions Defendant Forbes about his employment—both his current employment at UT Housing and previous position at Coca-Cola—as well as current rent and other financial questions. Defendant Forbes is placed back in the backseat of the patrol vehicle at 20:24:16.

Trooper Fletcher then begins searching the Honda at approximately 20:24:54, removes a yellow dog food bag from the floorboard of the front passenger seat, and instructs the other officer to ask Defendant Forbes and Codefendant Gilmore why the bag was glued. Defendant Forbes responds to the other officer that he was not sure but that his money was in there. Additionally, a

---

[5] The Court notes that portions of the audio recording are unintelligible due to the vehicles passing by.

tow truck arrives to tow away the Honda.  Ultimately, $13,130 is found in a plastic bag within the dog food bag.[6]

At approximately  20:37:34, after the search of the Honda, Defendant Forbes is instructed to exit the back seat of the patrol vehicle, patted down, and can be seen through the rear windshield of the interior dash cam counting items with either Trooper Fletcher or the other unidentified officer.  Then,  at  approximately  21:25:34,  Trooper  Fletcher  asks  Defendant  Forbes  and Codefendant Gilmore—who are both in the back seat of the patrol vehicle—whose money was in the  dog  food  bag  in  order  to  have  them  sign  a  piece  of  paper.   Trooper  Fletcher  then  informs Defendant Forbes that he was signing a form releasing the money to the THP at the current time. Trooper  Fletcher  also  asks  Defendant  whether  he  had  been  given  his  ID  back.   Next,  at approximately 21:30:58, while Trooper Fletcher was preparing to transport Defendant Forbes and Codefendant Gilmore to the Roane County Jail, and Defendant Forbes was placed in the back seat of  the  patrol  vehicle,  Defendant  Forbes  asks  "Did  y'all  count  that  money?"—to  which  Trooper Fletcher  responds  "No,  we  don't  count  it."   Defendant  Forbes  then  states,  "That's  fourteen,  one thirty,  to  be  exact."   Trooper  Fletcher  explains  that  it  is  taken  to  the  bank  to  get  an  official  count, and sealed on camera, to which Defendant Forbes responds "I hope you gonna' open it on camera [be]cause I don't want nothing missing from that, sir."

## IV.     ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  Defendant Forbes challenges the initial stop and subsequent search of the Honda on August 2, 2019, claiming that law enforcement lacked probable cause to stop or search the vehicle, and all evidence seized as a result of the illegal stop and seizure must be suppressed—

---

[6] A third, presumably, law enforcement officer dressed in plain clothes also arrived who was not identified by the parties.

including any and all statements made by him after the violation of his Fourth Amendment rights. The Court examines each of these issues in turn.

## A.     Initial Traffic Stop

Defendant Forbes asserts that he did not meaningfully violate Tenn. Code Ann. § 55-8-124(a), and that law enforcement thus used this statute as a pretext to stop and search the vehicle. The Government responds that two independent bases exist for the initial stop of the Honda: 1) that probable cause existed to stop the vehicle through the collective knowledge doctrine; and 2) that the Honda was following too closely, in violation of Tenn. Code Ann. § 55-18-124(a).

A traffic stop qualifies as a "seizure" for purposes of the Fourth Amendment. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). An officer may lawfully stop a car when there is probable cause to believe that a traffic violation has occurred or reasonable suspicion of an ongoing crime. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here is nothing unreasonable about stopping a vehicle whose driver has just committed a traffic violation.") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). However, the Sixth Circuit is clear that "[r]egardless of the officer's subjective motivations, a traffic stop is lawful if he has probable cause to believe a traffic violation occurred." *United States v. Warfield*, 727 F. App'x 182, 185–86 (6th Cir. 2018) (citing *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008)).

First, the Court finds that the totality of the circumstances provided probable cause for law enforcement to believe that a traffic violation had occurred. Tenn. Code Ann. § 55-8-124(a) provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." "Violation of this provision is a misdemeanor under state law."

*United States v. Howard*, 815 F. App'x 69, 73 (6th Cir. 2020) (citing Tenn. Code Ann. § 55-8-124(e)). Tennessee courts have not "delineat[ed] a standard for what constitutes a 'reasonable and prudent' following distance." *United States v. Collazo*, 818 F.3d 247, 255 (6th Cir. 2016). However, Defendant Forbes correctly states that the Sixth Circuit has expressed "concern[ ] with the subjective rule of reason in Tennessee on following too closely." *United States v. Barnes*, 19 F.3d 19 (Table), 1994 WL 75932, at *3 (6th Cir. 1994) (noting "[t]he circumstances surrounding a stop for following too closely on an expressway within city limits should be examined carefully where there is a challenge based on a pretextual stop"); *see, e.g.*, *United States v. Huff*, 630 F. App'x 471, 477 (6th Cir. 2015).

The Sixth Circuit has addressed the Tennessee statute for following too closely—Tenn. Code Ann. § 55-8-124(a)—on several recent occasions in *Huff*, *Collazo*, and *Howard*. Most recently, in *Howard*, the Sixth Circuit noted that "[f]aced with 'this interpretive vacuum, this court has consistently turned to the Tennessee Comprehensive Driver's License Manual (the Manual) for guidance." 815 F. App'x at 73 (quoting *Collazo*, 818 F.3d at 255). In particular, the Sixth Circuit in *Howard* acknowledged both its previous precedent in *Collazo* and *Huff*, as well as the proper interpretation of the Manual, detailing that:

> Prior to 2010, the Manual "provided that vehicles should 'maintain at least one car length for every ten miles per hour' of velocity." [*Collazo*, 818 F.3d at 255] (quoting *United States v. Huff*, 630 F. App'x 471, 497 (6th Cir. 2015)). Since 2010, the Manual has defined a safe following distance in terms of seconds rather than car lengths. *Id.* The Manual now provides that drivers should generally maintain a following distance of at least two seconds. Tenn. Dep't of Safety & Homeland Sec'y, *Tennessee Comprehensive Driver License Manual* 48–49 (July 1, 2018 ed.). During "interstate highway driving at higher speeds," however, drivers should maintain a following distance of "[a] minimum of four seconds." *Id.* at 49; *accord Collazo*, 818 F.3d at 255. We have made use of both rules in our post-2010 decisions. *See Collazo*, 818 F.3d at 256–57; *Huff*, 630 F. App'x at 498.
>
> These rules, of course, are just aids in determining whether a driver's following distance is reasonable; they are not independent legal requirements. *See Collazo*,

27

> 818 F.3d at 255; *Huff*, 630 F. App'x at 477 (opinion of Boggs, J.). Absent more concrete guidance from Tennessee's courts, however, they serve "as valuable guideposts when determining whether an officer possessed probable cause to stop a vehicle for violating § 55-8-124(a)." *Collazo*, 818 F.3d at 256.

*Id.* at 74. Regardless, "[a]lthough a manual oftentimes serves as a useful measure of reasonable and prudent driving, the statute, not Tennessee's driving manual, is the basis of the legal test." *Huff*, 630 F. App'x at 477.

In the instant case, Trooper Fletcher testified that his patrol vehicle was traveling approximately sixty miles per hour, and that he was maintaining the same consistent speed as the Honda; therefore, the Honda was also traveling at approximately sixty miles per hour. Accordingly, Trooper Fletcher testified that given the speed and road conditions, the Honda should have maintained a six-car-length distance with the vehicle in front of it. However, Trooper Fletcher provided his estimation that the Honda was three to four car lengths from the vehicle in front of it. Trooper Fletcher further testified that the Honda did not maintain a six-second elapsed duration from the car in front of it when passing a landmark to when the Honda passed the same landmark.

The Court notes that Trooper Fletcher testified that the Honda did not maintain a six-second following distance, rather than explicitly discussing the minimum four-second duration identified in the updated Manual. However, the Sixth Circuit has observed that the guideline of maintaining at least one car length for every ten miles per hour from the 2010 version of the Manual is also appropriate. *See Howard*, 815 F. App'x at 74 ("We have made use of both rules in our post-2010 decisions.") (citing *Collazo*, 818 F.3d at 256–57; *Huff*, 630 F. App'x at 498). The Court's review of the submitted exterior dash cam recording supports Trooper Fletcher's testimony. While not raining or dark at the time of the alleged violation, Trooper Fletcher stated that the particular area of interstate was designated as an area of concern by the THP. The exterior

28

dash cam video (Exhibit 1) details the level of incline of the stretch of Interstate 40, traffic barrels on alternating sides of the Interstate, as well as bright orange signs indicating uneven lanes. Accordingly, the Court finds that Trooper Fletcher had probable cause to believe that the Honda was following too closely to the vehicle in front of it.

Defendant Forbes largely does not challenge Trooper Fletcher's use of the car-length rule or lack of testimony on the four-second rule; rather, Defendant Forbes claims that the stop was pretextual and he did not meaningfully violate the statute. Further, Defendant Forbes argues that the vehicle in front of the Honda was driving closer to the vehicle in front of it than the Honda driven by Defendant Forbes. However, "[t]hat Defendant was stopped for the infraction–while others were not–does not dispute that Defendant was, in fact, following too closely." *United States v. Kelley*, No. 1:08-CR-51, 2008 WL 5412466, at *8 (E.D. Tenn. Dec. 29, 2008). Moreover, as the Court has previously detailed, law enforcement may stop a vehicle that commits a traffic violation, regardless of whether the traffic stop is pretextual. *See Wren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

Additionally, the record supports a finding that Trooper Fletcher had at least a reasonable suspicion that Defendant Forbes, or—at a minimum—Codefendant Gilmore, were engaged in criminal activity prior to stopping the Honda. The Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The Sixth Circuit

29

has also adopted and applied the "collective knowledge rule," through which a court "impute[s] collective knowledge among multiple law enforcement agencies" and permits "a responding officer [to execute] a stop at the request of an officer who possess the facts necessary to establish reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012).

Under *Terry v. Ohio*, 392 U.S. 1 (1968), police may stop a motor vehicle if they have reasonable suspicion of an ongoing crime. Reasonable suspicion must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 21–22. "[A]n inchoate and unparticularized suspicion or hunch of criminal activity" does not amount to reasonable suspicion. *Blair*, 524 F.3d at 750 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). "Reasonable suspicion must be considered 'under the totality of the circumstances, considering all of the information available to law enforcement officials at the time.'" *Lyons*, 687 F.3d at 763. Courts should consider "the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Id.* (internal quotations omitted).

THP officials were in contact with the FBI throughout August 2, 2019, and Agent Slone testified that the wiretap investigation into the local Vice Lords intercepted conversations between Codefendants Gilmore and Stewart discussing collecting drug proceeds to meet with a source of supply in Nashville in order to obtain crystal methamphetamine. Law enforcement physically surveilled the Honda enter the TA truck stop, Codefendant Stewart enter the Honda, and then return to his own vehicle. Agent Slone testified that this information, as well as Codefendant Gilmore's active probation violation, was communicated to the THP. Additionally, Trooper Fletcher testified that was informed by his sergeant that the two individuals in the vehicle were

part of the Vice Lords and were transporting illegal proceeds from drug trafficking, as well as that Codefendant Gilmore had an active probation violation.

Therefore, "the officer[ ] had at least reasonable suspicion before stopping the vehicle that one of its occupants had committed a felony and, further, might be in possession of contraband." *United States v. Dickens*, 748 F. App'x 31, 39 (6th Cir. 2018); *see, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (indicating that "cause to believe any occupant of the vehicle is involved in criminal activity" satisfies "the first *Terry* condition . . . to detain an automobile and its occupants"); *United States v. Jenkins*, 266 F. Supp. 3d 980, 985 (E.D. Mich. 2017) (finding "even if the traffic stop was not supported by probable cause, it was still legal because [law enforcement] had reasonable suspicion that Defendant was involved in drug trafficking," in part, under "the collective knowledge doctrine applie[d] to the reasonable suspicion analysis").

## B. Scope and Duration of Traffic Stop

The Court next analyzes the scope and duration of the traffic stop. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio*, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). A seizure is reasonable under the *Terry* framework if the detention is "limited in [both] scope and duration." *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (brackets in original) (citing *Florida v. Royer,* 460 U.S. 491, 500 (1983)).

31

"Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). An investigating officer must use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500.

The Sixth Circuit has held that there is no set length of time after which a traffic stop becomes per se unreasonable. *See Everett*, 601 F.3d at 493. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop). The Supreme Court and the Sixth Circuit have specified what actions an officer may take without extending the duration of the traffic stop. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Officers may ask questions that are related or unrelated to the reason for the stop, as long as "any prolongation due to suspicionless unrelated questioning [was] reasonable." *Everett*, 601 F.3d at 494; *United States v. Hill*, 195 F.3d 258, 268–69 (6th Cir. 1999).

Ultimately, the Court finds that the scope of the investigatory detention during the traffic stop was reasonable, as Trooper Fletcher questioned Defendant Forbes regarding his travel plans,

obtained the vehicle registration, and reviewed Defendant Forbes' driver's license information due to his suspended status. Trooper Fletcher also encountered difficulties in obtaining Codefendant Gilmore's applicable identifying information—through Defendant Forbes' hesitation in providing his name, lack of a driver's license, and running of Codefendant Gilmore's criminal history through dispatch. Additional difficulties relating to an extension of the traffic stop were the fact that neither Defendant Forbes or Codefendant Gilmore owned the Honda, that there was not insurance for the vehicle, as well as that Defendant Forbes stated that he had paid the fines necessary for his license to be unsuspended.

Under *Rodriguez*, these activities are all "ordinary inquiries incident to [the traffic] stop." 575 U.S. at 355 (quoting *Caballes,* 543 U.S. at 408). "[C]ontext-framing questions," such as travel history and plans, "will rarely suggest a lack of diligence." *Everett*, 601 F.3d at 495. Further, Trooper Fletcher's questions regarding Codefendant Gilmore were permissible because they were "locomotion-related inquiries not strictly directed to the motorist's conduct at the time of the stop, such as '[the] motorist's travel history and travel plans' and 'the driver's authority to operate the vehicle . . . .'" *Id.* at 494 (quoting *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001)). Generally, "[r]equesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation are permissible police acts within the scope of the traffic stop." *United States v. Bonilla,* 357 F. App'x 693, 696 (6th Cir. 2009) (citing *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999)).

Moreover, the Court finds the scope of the initial traffic stop was reasonable due to the number of occupants in the vehicle. In *United States v. Torres-Ramos*, the Sixth Circuit stated that "[i]ssuing a speeding ticket does not require an officer to detain an individual in order to separately question a passenger regarding ownership or travel plans." 536 F.3d 542, 551 (6th Cir. 2008).

33

However, unlike in *Torres-Ramos*, Trooper Fletcher immediately asked Defendant to exit the vehicle, and thus, Trooper Fletcher "had not completed his traffic stop when he requested [the driver to] exit the vehicle because [he] had not yet completed his actions in connection with the issuance or non-issuance of a citation . . . ." *United States v. Dixon*, 405 F. App'x 19, 22 (6th Cir. 2010). Additionally, Trooper Fletcher testified that it was his common practice to have the driver sit in the passenger seat of his patrol vehicle for similar stops, regardless of whether he had received prior information. Trooper Fletcher further testified that Defendant initially attempted to get out of the Honda on his own.

As there is no specific time limit to determine the reasonableness of a traffic stop, "the proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*—including any prolongation due to suspicionless unrelated questioning—was reasonable." *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) (quoting *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008)).

The Court agrees with the Government that the traffic stop lasted approximately eight minutes and thirty-seven seconds from initiation until Trooper Fletcher asked Defendant to step out of the patrol vehicle while Trooper Fletcher confirmed whether his driver's license was suspended and thus, he was operating the vehicle illegally.[7] Subsequently, Defendant Forbes was placed in handcuffs in the back of the patrol vehicle. The Court has detailed the added difficulties involved for Trooper Fletcher to verify the registered insurance of the vehicle, the driver's license of the driver (Defendant Forbes), and the confirmation of whether an arrest warrant existed for Codefendant Gilmore. Ultimately, the facts and circumstances in the present case support the

---

[7] While the parties did not provide a specific argument of how long the traffic stop lasted, the Court notes that the Honda begins to pull over at approximately 20:02:53 on the video recording, and Defendant Forbes is asked to step out of the patrol vehicle while Trooper Fletcher confirms his suspended license status at approximately 20:11:30.

34

conclusion that the duration of the traffic stop was reasonable. *See, e.g.*, *United States v. Marsh,* 443 F. App'x 941, 943–44 (6th Cir. 2011) (holding that a traffic stop lasting fifteen minutes was not longer than necessary to complete the purpose of the stop); *United States v. Ellis*, 497 F.3d 606, 613–14 (6th Cir. 2007) (holding a stop that lasted thirteen minutes and thirty-nine seconds did not constitute a prolonged seizure).

## C.    Reasonable Suspicion of Criminal Activity

The Court also finds that Trooper Fletcher's suspicions of criminal activity increased throughout the traffic stop to where he had a reasonable suspicion of criminal activity requiring an extension of the traffic stop.  "If an officer has a reasonable and articulable suspicion of criminal activity, he may extend the traffic stop long enough to confirm or dispel his suspicions." *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012).  When evaluating whether a crime is afoot, law enforcement officers may draw upon their training and experience "to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation omitted).

Again, in considering whether reasonable suspicion exists, it is "well-established that an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (internal citations omitted).  "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." *Id.* at 766 (noting "[t]he collective knowledge doctrine applies equally to traffic stops and to vehicle searches").  The collective knowledge doctrine requires three separate inquiries: "(1) the officer taking the action

35

must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.* at 767.

Ultimately, although Trooper Fletcher did not listen to any of the wiretapped calls involving Codefendants Gilmore and Stewart, he was aware of the ongoing investigation and believed that the Honda, driven by Defendant Forbes, was transporting drug proceeds to Nashville. Agent Slone testified that the FBI intercepted communications between Codefendants Gilmore and Stewart discussing the collection of drug proceeds necessary to obtain methamphetamine from their source of supply in Nashville, in connection with physical surveillance of Codefendant Stewart entering the Honda at the planned meeting at the TA truck stop.

Further, Trooper Fletcher testified that during the traffic stop, he was initially suspicious because of the received information that the individuals in the Honda were to be considered potentially armed and dangerousness, transporting illegal proceeds from drug trafficking, were affiliated with the Vice Lords, and that the passenger of the vehicle had an active violation of probation warrant for aggravated assault and carjacking. Trooper Fletcher stated that upon stopping the vehicle, his suspicions were increased because after approaching the Honda, Defendant Forbes started to open the driver's side door and put his left leg out. Additionally, Trooper Fletcher testified that Codefendant Gilmore was looking directly forward and not acknowledging him. Trooper Fletcher stated that his suspicions increased based upon the occupants' continued nervousness, despite telling Defendant Forbes and Codefendant Gilmore that he intended to only issue a warning or a citation. Here, Trooper Fletcher testified that Defendant Forbes was sweating profusely throughout the traffic stop, as well as upon sitting in the front seat of the patrol vehicle, Defendant Forbes had an extremely dry mouth and shortness of breath.

Trooper Fletcher pointed to Defendant Forbes' inability to answer simple questions and respond in a timely manner, such as providing the name of Codefendant Gilmore—who Defendant later acknowledged as a life-long friend. Trooper Fletcher also stated that his suspicions increased based on Defendant's repeated use of convincing statements, such as "I promise you, I'm telling you the truth, I'm not lying." Trooper Fletcher alleged that Defendant was unable to commit to providing answers, such as how long he was staying in Nashville.

While nervous behavior, standing alone, is insufficient to justify reasonable suspicion, it "is still relevant to the reasonable-suspicion calculus." *United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). In *Pacheco*, the Sixth Circuit held that nervousness is a permissible factor to consider when determining whether the officers had developed reasonable suspicion during a traffic stop. *Id.*; *see*, *e.g.*, *United States v. Branch*, 537 F.3d 582, 588–89 (6th Cir. 2008) (finding reasonable suspicion, in part, because the officers "observed increasing nervousness" as the traffic stop progressed).

Ultimately, officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation omitted). "In considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez,* 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith,* 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)).

The Court finds that the factors relied upon by Trooper Fletcher established, in the aggregate, reasonable suspicion. First, Trooper Fletcher detailed his initial reasonable suspicion

that Defendant Forbes was transporting illegal drug proceeds due to the information received by the FBI. *See, e.g.*, *United States v. Adams*, No. 09-20224, 2010 WL 3504072, at *11 (E.D. Mich. Mar. 10, 2010) (finding state troopers "could defensibly act in reliance on the directions of the police dispatch and the DEA" where the troopers were notified by their dispatch of a vehicle description and license number of a vehicle that the DEA wished to stop for the purpose of seizing narcotics after learning in part through wiretaps that the defendant was transporting narcotics, and the DEA officer had probable cause to believe that the suspect's vehicle contained contraband), *report and recommendation adopted by*, 2010 WL 3504065 (E.D. Mich. Sept. 2, 2010).

Next, Trooper Fletcher testified that several factors during the traffic stop, such as Defendant Forbes' increasing nervousness and behavior, physical symptoms, inability to commit to answers or provide information, and use of convincing statements increased his suspicion throughout the stop. *See, e.g.*, *United States v. Bernal*, No. 5:17-102-DCR, 2017 WL 5629533, at *4 (E.D. Ky. Nov. 22, 2017) (finding reasonable suspicion from the defendants' behavior, as well as information previously received from a confidential informant, as "[i]n other words, [the officer's] suspicion was properly heightened, not dispelled, during the questioning of the defendants"). "[E]ven a string of innocent behavior added together may amount to a reasonable suspicion of criminal activity." *United States v. Richardson*, 358 F.3d 625, 631 (6th Cir. 2004) (citing *United States v. Arvizu*, 534 U.S. 266, 273–75 (2002)).

Further, Trooper Fletcher was permitted initially "to explain the reason for the stop." *United States v. Simpson*, 520 F.3d 531, 543 (6th Cir. 2008). "[A]n officer may ask unrelated questions to his heart's content, provided he does so during the supposedly dead time while he . . . is completing a task related to the traffic violation." *United States v. Everett*, 601 F.3d 484, 492 (6th Cir. 2010). Therefore, even though some of the questions Trooper Fletcher asked were

unrelated to the traffic stop, this line of questioning largely occurred while he was obtaining the information of the driver and the passenger in the vehicle, his questions were "calculated to investigate whether the Defendants were engaged in drug crimes," and he "acted diligently to either confirm or dispel his suspicions of illegal drug possession." *See United States v. Howard*, No. 3:18-CR-29-TAV-HBG, 2018 WL 6595364, at *15 (E.D. Tenn. Oct. 5, 2018), *report and recommendation adopted by*, 2018 WL 6061439 (E.D. Tenn. Nov. 20, 2018), *aff'd*, 815 F. App'x 69 (6th Cir. 2020)

Accordingly, the Court finds that the detention was reasonable both in scope and duration because reasonable suspicion of criminal activity arose during Trooper Fletcher initial questioning of the occupants of the vehicle. *See, e.g.*, *United States v. Torres-Ramos*, 536 F.3d 542, 553 (6th Cir. 2008) (finding reasonable suspicion existed in challenge to traffic stop based on both weak and strong factors such as inconsistent stories and an ongoing DEA wiretap of the vehicle's owner).

### D. Consent to Search Vehicle

The Government claims that the resulting search of the Honda was permissible because Defendant Forbes provided consent to search the vehicle, but Defendant Forbes asserts that he was "tricked" into giving consent. As detailed above, the alleged consent to search the Honda occurred when Defendant Forbes was outside of the patrol vehicle, while Trooper Fletcher was readjusting his handcuffs. This questioning occurred approximately eighteen minutes after Trooper Fletcher first approached the Honda. Specifically, the alleged consent occurred during the following exchange:

> Trooper Fletcher: Do you give me consent to search the vehicle, contents, containers, anything suspicious therein?
>
> Defendant Forbes: No, sir.
>
> Trooper Fletcher: You don't give me permission?

39

Defendant Forbes:  Yes, yeah.   I got nothin' but a lot of money in there.

Trooper Fletcher then proceeded to search the vehicle, including a request for the other officer to ask Defendant Forbes why the dog food bag was sealed.

Defendant Forbes argues that he was in custody at the time of the alleged consent and that it was clear from the Government's submitted transcript [Doc. 347-1] that he responded "No" to Trooper Fletcher's initial question seeking consent to search to the vehicle.  During the hearing, the Government acknowledged that Defendant Forbes was in custody at the time that he was asked for consent, as well as that it was equivocal on a surface level as to whether or not Defendant Forbes gave knowing and voluntary consent due to the nature of the dialogue between Trooper Fletcher and Defendant Forbes.  However, the Government maintains that the context of their previous communication provides that Defendant Forbes provided knowing, voluntary, and intelligent consent to search the vehicle.

The Fourth Amendment protects citizens against unreasonable searches or seizures.  U.S. Const. amend IV.  To comport with the Constitution, searches must be pursuant to a warrant, which "shall issue [only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Id.*  The Supreme Court has instructed that assessing the reasonableness of a warrantless search must begin with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal footnote omitted).

An individual's voluntary consent to a search is an exception to the warrant requirement of the Fourth Amendment.  A valid search may be made without a warrant and without probable

40

cause if the person voluntarily consents to the search. *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 228–29 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). Whether this exception applies is evaluated by examining the totality of the circumstances, with the burden resting on the Government to prove both actual consent and its voluntary nature. *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The Government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999).

"Consent to a search must be voluntary and free of duress or coercion, express or implied." *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016); *Worley*, 193 F.3d at 386 (requiring that consent to search be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion"). In determining whether consent was voluntary, the Court considers the totality of the circumstances, including the "characteristics" of the consenting individual, such as (1) the individual's age, intelligence, and education level; (2) whether the individual understood she had the right to decline to consent; and (3) whether the individual understood her constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). The Court also considers the "details of the detention," such as (4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an individual's] judgement.'" *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); *see also Worley*, 193 F.3d at 386.

In this case, Trooper Fletcher solicited consent when Defendant Forbes had been detained for eighteen minutes. During the length of the detention, Trooper Fletcher had been completing a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and insurance status, Defendants' driving

history, a NCIC check of Defendant Gilmore, as well as asking Defendant Forbes routine questions concerning his destination and the purpose of the trip. Once it was determined that Defendant Forbes' license was suspended, he was placed in handcuffs positioned behind his back and seated in the back of the police cruiser. As Trooper Fletcher is waiting on additional information concerning the status of the license suspension, he asks Defendant Forbes if he needs additional air conditioning, retrieves a towel from the trunk to dry sweat from Defendant Forbes' face, and readjusts Defendant Forbes' glasses for him. Shortly thereafter, Trooper Fletcher removes Defendant Forbes from the police cruiser and moves Defendant Forbes' handcuffs from his back and replaces them in the front of his body. It is during this time that Trooper Fletcher asked for Defendant Forbes' consent to search the vehicle. While Defendant Forbes asserts that he was "tricked" into giving consent, he makes no argument that there was any overt act, threat of force, or any subtle forms of coercion used to elicit consent. *See United States v. Watson*, 423 U.S. 411, 424 (1976) (noting lack of evidence as to these various factors in ruling that consent was not coerced). Further, in reviewing the video and audio recording of the stop and considering Trooper Fletcher's testimony during the suppression hearing, the Court finds no indication of any verbal gamesmanship by Trooper Fletcher during his exchange with Defendant Forbes' regarding the consent to search.

"The government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)). Here, the Court is unconvinced in light of the totality of circumstances that Defendant was in any way tricked into giving consent for the search of the vehicle. While recognizing that Defendant

42

Forbes' initial response was "No" to Trooper Fletcher's request to search, Trooper Fletcher immediately sought to clarify by stating, "You don't give me permission to search." While this was more of a statement rather than a neutral question, it plainly sought clarification as to whether Defendant Forbes was giving permission to search the vehicle, and he still could have refused to consent to the search. Defendant Forbes' immediate response indicated he was confirming that he was consenting with "Yes, yeah. I got nothin' but a lot of money in there."[8] He responded without any hesitation, asked no questions or in any other way indicated a lack of understanding. Moreover, he never objected to the search and only expressed concern in ensuring that the amount of cash in the vehicle was counted accurately, further demonstrating that he understood the situation and the import of the search.

Although the Government concedes that Defendant was in custody at the time he provided consent, "the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976); *see United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). The Supreme Court has also rejected the argument that "consent could not be valid unless the defendant knew that he had a right to refuse the request," as it is merely "one factor to be taken into account." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 219, 227 (1973)). "Rather it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." *Schneckloth*, 412 U.S. at 233.

---

[8] Without extensively discussing their admissibility at this time, the Court has examined Defendant's statements in response to Trooper Fletcher's request for his consent to search the Honda as a part of its totality of the circumstance analysis. *See infra* fn. 9 (noting that the Sixth Circuit has held that the consent to search is a non-testimonial act that does not implicate the defendant's Fifth Amendment rights).

Considering the totality of the circumstances, the Court finds that the Government has met its burden in establishing that Defendant Forbes' consent was voluntary and unequivocally given. Although Defendant's initial response appeared equivocal, the benefit of the video and audio recordings dispels any question that Trooper Fletcher sought clarification, which then confirmed Defendant's voluntary consent. Defendant Forbes responded, "Yes, yeah," and then stated "I got nothin' but a lot of money in there" in a fairly relaxed, conversational tone. Defendant Forbes is an educated adult male, who had been conversing in an intelligent manner with Trooper Fletcher. While at times Defendant Forbes' answers may have appeared evasive or somewhat nonsensical, he was engaged and cooperative and responded in a calm manner. Defendant had communicated with Trooper Fletcher throughout most of the traffic stop, and while exhibiting signs of nervousness such as sweating and dry mouth, he did not appear to be overwhelmed by law enforcement. Defendant makes no allegation that Trooper Fletcher demonstrated any show of force or employed any stern or threatening language. Trooper Fletcher's professional mannerism was borne out by the video and audio recording as well as his testimony at the hearing, which showed that he took steps to ensure Defendant Forbes' comfort, such as increasing the flow of air conditioning, retrieving a towel to dry sweat from his face, adjusting his glasses, and then removing him from the car to switch his handcuffs from the back to the front of his body. In sum, nothing in the event surrounding Defendant Fletcher's consent to search was indicative of any trickery or coercion to result in a finding that his consent was involuntary. Accordingly, the Court finds that Defendant Forbes did voluntarily and unequivocally consent to the search of the vehicle.

44

### E. Probable Cause to Search Vehicle

The Government also claims that regardless of whether Defendant Forbes provided consent to search the Honda, probable cause existed to search the vehicle based upon the intercepted communications and physical observation of the surveillance units.

One exception to the warrant requirement concerns searches of vehicles, where the Supreme Court has stated that "[e]ven in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." *California v. Carney*, 471 U.S. 386, 391 (1985). Pursuant to the automobile exception, law enforcement may conduct a warrantless search of a vehicle if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal citations omitted). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (quoting *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994)). "The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *Smith v. Thornburg*, 136 F.3d 1070, 1074–75 (6th Cir. 1998)).

Ultimately, the Court finds that law enforcement had probable cause that evidence of drug trafficking would be present in the Honda prior to the search. *See United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) ("[A]n officer may perform a warrantless search of a detained vehicle if the officer has probable cause to believe the vehicle contains contraband or evidence of criminal activity."). Through the collective knowledge doctrine, as detailed throughout this opinion, Trooper Fletcher and law enforcement were aware of the ongoing investigation into drug

45

trafficking by the local Vice Lords gang. In particular, Agent Slone testified that throughout August 1 and 2, 2019, Codefendants Gilmore and Stewart were attempting to procure money and pull the collected drug proceeds together to purchase methamphetamine from their source of supply in Nashville. Codefendants Gilmore and Stewart had several phone calls talking about where the money was coming from, how much they currently had, and how much they could gather during the next day. Eventually, Codefendants Gilmore and Stewart were discussing collecting drug proceeds in excess of $14,000 and made plans to meet at the TA truck stop off of Watt Road on August 2, 2019. Law enforcement further knew that Codefendant Gilmore was a passenger in a silver Honda Accord. Further, Agent Slone testified that law enforcement witnessed the arranged meet-up at the TA truck stop on August 2, 2019, and Codefendant Gilmore and Defendant Forbes drive away in the Honda. Agent Slone and Trooper Fletcher testified that this information was provided to the THP.

When Trooper Fletcher stopped the Honda, the information leading to a finding that probable cause existed that evidence of drug trafficking was present in the vehicle was not dispelled during the initial investigatory detention. Defendant Forbes stated that he and Codefendant Gilmore were travelling to Nashville, Tennessee and the suspected collected drug proceeds were not found during the brief protective searches of Defendant Forbes and Codefendant Gilmore. Accordingly, as law enforcement knew that Codefendants Gilmore and Stewart had collected a significant amount of drug proceeds to purchase methamphetamine, had met at the arranged location, and that Defendant Forbes and Codefendant Gilmore had drove away on Interstate 40 westbound towards Nashville, probable cause existed that the collected money to purchase methamphetamine was inside of the Honda. *See United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) ("At the time police stopped and searched Arnold's vehicle, they had

probable cause to believe Arnold's car contained contraband and were, therefore, justified in their warrantless search."); *see, e.g.*, *United States v. Turner*, No. CR 18-53-DLB-CJS-1, 2019 WL 2814648, at *5 (E.D. Ky. July 2, 2019) ("Put simply, the officers' first-hand observation of phone calls arranging a controlled buy, the verification of the details discussed during those calls, and West's act of transporting drugs to the proposed drug deal created probable cause to search the vehicle West was traveling in."); *United States v. Sayles*, No. 11-CR-30162-WDS-1, 2012 WL 1297836, at *5 (S.D. Ill. Apr. 16, 2012) (finding that probable cause existed to search the defendant's vehicle "because it was reasonable to believe that it contained evidence of drug trafficking, including, for example, cocaine or 'buy money' used in the controlled purchase").

### F.      Inevitable Discovery Doctrine

The Government also maintains that even if probable cause did not exist to search the Honda, the $13,130 concealed in the dog food bag would have been inevitably discovered because the Honda would have been thoroughly searched pursuant to the THP's inventory search policy. The Government argues that Trooper Fletcher arranged for the Honda to be towed to the THP's impound lot due to the arrests of Defendant Forbes and Codefendant Gilmore. Defendant Forbes does not specifically address any arguments relating to the inevitable discovery of the money found in the dog food bag or the THP inventory search policy.

Trooper Fletcher testified that when both occupants of a vehicle are under arrest, and the vehicle cannot be driven off the interstate, the THP's policy is to tow the vehicle. Trooper Fletcher stated that he arranged for the Honda to be towed on August 2, 2019. Additionally, Trooper Fletcher stated that the THP's inventory search policy is to ensure that all property within a vehicle, locked or unlocked, is documented and secure. Trooper Fletcher clarified that the THP inventory

search policy includes all areas of the vehicle, including the truck and locked or unlocked containers.

"The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995). The inevitable discovery exception "applies when the government can demonstrate either [1] the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence[;] or [2] other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Kennedy*, 61 F.3d at 499; *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008). "The 'other compelling facts' prong of *Kennedy* entails following routine procedures or some other private search without governmental involvement." *United States v. Jordan*, 417 F. Supp. 3d 950, 960 (N.D. Ohio 2019).

"An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir.), *cert. denied*, 141 S. Ct. 333 (2020) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990); *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987)). The Sixth Circuit has recognized that a valid inventory search may be sufficient to invoke the inevitable discovery doctrine. *See, e.g.*, *United States v. Robinson*, 390 F.3d 853, 871 (6th Cir. 2004) (where inventory search would have been conducted in accordance with written police policy, contents of vehicle admissible under doctrine of inevitable discovery); *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001) (proof that contraband would have been detected in

48

an inventory search that would inevitably follow seizure of a car is sufficient to invoke the inevitable discovery exception to the exclusionary rule).

"A warrantless inventory search may only be conducted if police have lawfully tak[en] custody of a vehicle." *United States v. Smith,* 510 F.3d 641, 651 (6th Cir. 2007) (internal quotation marks omitted). The Sixth Circuit recently summarized that:

> Officers exercising their discretion to impound a vehicle must do so "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." [*United States v. Jackson*, 682 F.3d 488, 454 (6th Cir. 2012)] (quoting *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001)). Similarly, "[i]n order to be deemed valid, an inventory search may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures.'" *Smith*, 510 F.3d at 651 (quoting *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998)); *see also United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020) (stating that the inventory exception applies only when officers follow "'standardized criteria' or 'established routine' governing the scope of the inventory searches'" (quoting *Florida v. Wells*, 495 U.S. 1, 4, (1990))). The search is unconstitutional if "the evidence establishes that the 'police acted in bad faith or for the sole purpose of investigation' in conducting an inventory search." *Hockenberry*, 730 F.3d at 659 (quoting *United States v. Vite-Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003)). In other words, officers cannot hide an investigative search under the pretext of an inventory search. *See id.*; *South Dakota v. Opperman*, 428 U.S. 364, 375–76 (1976). That said, "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Smith*, 510 F.3d at 651.

*United States v. Snoddy*, 976 F.3d 630, 634 (6th Cir. 2020), *cert. denied*, No. 20-6774, 2021 WL 666692 (U.S. Feb. 22, 2021). The Sixth Circuit has "held that while such a policy must be sufficiently well-defined, it does not necessarily have to be written." *Alexander*, 954 F.3d at 915 (citing *United States v. Tackett*, 486 F.33d 230, 233 (6th Cir. 2007)).

Here, Defendant Forbes does not dispute that the Honda would have been properly towed off of the interstate due to both occupants of the vehicle being placed under arrest. Trooper Fletcher testified that he did, in fact, arrange for the Honda to be towed in the present case. Additionally, Trooper Fletcher stated that a THP inventory search policy was in place and that the

policy permitted a search of all areas of the vehicle, including locked or unlocked containers. In *Snoddy*, the Sixth Circuit upheld an impoundment and inventory search by the THP of a vehicle where the defendant was "the sole occupant of the car, and the car would have been left out on the side of the highway," after the defendant was arrested on outstanding warrants. 976 F.3d at 632. The Sixth Circuit cited to "General Order 513 of the Tennessee Department of Safety," which provided that "under the policy, once an officer has exercised her discretion to impound the vehicle, the officer *must* conduct an inventory before towing." *Id.* at 635.

Accordingly, the Court also finds that regardless of Trooper Fletcher's motivation or beliefs, the Honda would have been searched pursuant to the THP's inventory search policy, as Trooper Fletcher testified that he called for the Honda to be towed away due to both of its occupants being arrested. Similar to *Snoddy*, Trooper Fletcher and the THP would then be required to conduct an inventory search before towing the vehicle. While the official policy was not introduced into the record, Trooper Fletcher testified that the THP has an established inventory search policy, which extends to all property within the vehicle—included locked or unlocked containers. *Cf. Alexander*, 954 F.3d at 916 ("Even though there existed regulations governing *when* inventory searches were permissible, there were no established procedures that governed *how* the inventory searches were to be conducted."). Critically, Defendant Forbes does not argue that the inventory search policy would not encompass a search of the dog food bag found in the floorboard of the front passenger seat of the Honda. Therefore, the Court finds that the inevitable discovery doctrine also serves as an independent justification for the search of the Honda.

## G.     Defendant Forbes' Statements to Trooper Fletcher

Defendant Forbes moves to suppress all statements made as a result of the search and seizure of the Honda. Defendant Forbes maintains that he was under interrogation and was never

50

read his *Miranda* rights from the time that he got in the patrol vehicle until he was taken to jail. Therefore, Defendant Forbes seeks to suppress his statements during the interrogation, as well as the search of the Honda and the seized money.

The Government responds that Defendant Forbes was not in *Miranda* custody when he was originally seated in the patrol vehicle and made several voluntary statements at the beginning of the traffic stop. However, the Government asserts that he did eventually come into *Miranda* custody—and was not read his *Miranda* rights—when he was handcuffed, and, accordingly, the Government will not use these voluntary statements in its case-in-chief. Nevertheless, the Government claims that although un-*Mirandized*, Defendant Forbes subsequently made several voluntary spontaneous utterances about the amount of money in the vehicle and his interest in it, and thus these statements are admissible because they were not made in response to any THP interrogation or its functional equivalent.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." To ensure this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

Law enforcement officers must advise a person of the *Miranda* warnings when the person is questioned while in police custody. *Miranda*, 384 U.S. at 478–79; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (holding that the obligation to administer *Miranda* warnings only arises if there has been "such a restriction on a person's freedom as to

51

render him 'in custody'").  In the instant case, it is not disputed that Trooper Fletcher questioned Defendant Forbes while he was placed in both the front and back seat of the patrol vehicle.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" under *Miranda* "express questioning [by the police] or its functional equivalent[,]" which is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect").  With respect to the initial questioning, the issue in this case is whether Defendant Forbes was in custody for purposes of the Fifth Amendment at the time Trooper Fletcher questioned him.

To determine whether an individual is in custody for purposes of receiving the *Miranda* warnings, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. *Stansbury*, 511 U.S. at 318 (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); *Salvo*, 133 F.3d at 948.  In other words, would a reasonable individual in the same position as the Defendants have felt free to leave.  *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).  The Sixth Circuit has set forth several factors useful in determining whether an individual is in custody:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo*, 133 F.3d at 950; *see also Swanson*, 341 F.3d at 529.  Ultimately, the Court must decide "whether there is a formal arrest or restraint on freedom of movement of the degree associated

with a formal arrest." *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *see also Swanson*, 341 F.3d at 529.

While acknowledging that a traffic stop curtails the driver's and the passengers' freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984). In so holding, the Court likened a traffic stop to a "*Terry* stop" and observed that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440. However, an investigatory detention can evolve into a custodial interrogation. *Knox*, 839 F.2d at 292 & 296 (Jones, J., concurring).

### 1.    Statements Before Being Handcuffed

The Government claims that Defendant Forbes was not in custody under *Miranda* when he made several voluntary statements at the beginning of the traffic stop. Ultimately, the Court agrees with this analysis, and finds that Defendant Forbes was not in custody until he was placed in handcuffs in the back seat of the patrol vehicle.

First, while Defendant Forbes was seated in the front seat of the patrol vehicle, he was not in handcuffs and was not transported to an unfamiliar location to be questioned. Defendant Forbes was not moved to the patrol vehicle midway through questioning, as Defendant Forbes wished to get out of the Honda and Trooper Forbes almost immediately placed him in the front seat of the patrol vehicle. *See United States v. Richardson*, 949 F.2d 851, 857–58 (6th Cir. 1991) (holding that detention in a police car does not automatically constitute an arrest but may do so when the detention exceeds the purpose and objective of the stop.); *see, e.g.*, *United States v. Iturbe-Gonzalez*, 100 F. Supp. 3d 1030, 1037 (D. Mont. 2015) (finding where the defendant sat in the

53

front seat of the patrol vehicle "and engaged in generally friendly conversation . . . [t]he fact that Iturbe-Gonzalez was seated in the patrol car did not take this encounter outside the scope" of the ordinary traffic stop, and thus "no *Miranda* warnings were required during the first twenty-seven minutes of the encounter while Iturbe-Gonzalez spoke with Trooper Amundson while the traffic ticket was processed"), *aff'd*, 705 F. App'x 486 (9th Cir. 2017); *United States v. Mendez-Bernal*, No. 3:19-CR-010-TCB-RGV, 2020 WL 6495109, at *14 (N.D. Ga. July 22, 2020) ("A reasonable person in Jose's circumstances would not regard sitting unrestrained in the front seat of a patrol car as the functional equivalent of being arrested."), *report and recommendation adopted by*, 2020 WL 5494728 (N.D. Ga. Sept. 11, 2020). "The place of the questioning in the present case is substantially less hostile or coercive than in other cases in which this court or the Supreme Court has held that a detainee was not entitled to a *Miranda* warning." *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003) (collecting cases in which individuals were questioned at police stations and found not to be in custody for purposes of *Miranda*).

Next, "[t]he questioning of Defendant was extremely limited in that it involved typical investigatory questioning." *United States v. Jackson*, No. 2:20-CR-65, 2021 WL 530993, at *5 (E.D. Tenn. Feb. 12, 2021). Trooper Fletcher engaged Defendant Forbes in a conversational tone, and although he questioned whether Defendant Forbes was alright, "the circumstances of the interrogation did not grow increasingly intimidating as the questioning continued, but the cordial tone remained the same throughout." *Id.* As detailed above, Trooper Fletcher did not unnecessarily prolong the investigatory detention at this point, and instead asked context-framing questions normal to a traffic stop. *Cf. United States v. Eberhardt*, 416 F. Supp. 3d 700, 707 (W.D. Ky. 2019) ("And the officers showed virtually no interest in the claimed purpose for the stop,

embarking on a sustained course of questioning about whether there was anything illegal in the car without bothering to check Eberhardt's license or registration.").

During the initial questioning in the front seat of the patrol vehicle, Defendant Forbes "did not possess unrestrained freedom of movement during the questioning, because he was subject to a *Terry* stop." *Jackson*, 2021 WL 530993 at *5. However, "[w]hile he was not free to leave because of the ongoing traffic stop, Defendant [Forbes] was not handcuffed [at this time]." *Id.* While the front seat of a patrol vehicle may be more coercive than being questioned inside of one's vehicle or generally being outside, Trooper Fletcher was the only member of law enforcement questioning Defendant Forbes, and no member of law enforcement drew their weapons or involved the use of force. *See Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) ("The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability . . . [C]ircumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police.").

The Court acknowledges that Defendant Forbes was not told that he did not have to answer Trooper Fletcher's questions. This fact, alone, however does "not automatically render the encounter custodial." *Jackson*, 2021 WL 530993 at *6 (citing *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (finding that, although the officers never told a suspect that she did not need to answer their questions and could end the interview at will, the existence of such advice is one factor among many and is not a necessary condition)). Therefore, "[w]hile there were coercive aspects to the situation," including being placed in a patrol vehicle and Defendant Forbes not being informed that he did not need to answer any questions, "a non-custodial situation is not converted into one in which *Miranda* applies simply because the questioning took place in a 'coercive environment.'" *Id.* (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

Additionally, although Trooper Fletcher was aware of FBI's investigation into the Vice Lords, a reasonable person would not have known that it was the THP's purpose for effectuating the stop. *See Stansbury v. California*, 511 U.S. 318, 323 (1994) (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); *Berkemer v. McCarty*, 468 U.S. 320, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *United States v. Salvo*, 133 F.3d 943, 952 (6th Cir. 1998) ("[A] custody determination does not depend on the subjective knowledge of the interrogating officers.").

Under the totality of the circumstances, the Court finds that Trooper Fletcher's initial questioning of Defendant Forbes in the front seat of the patrol vehicle did not turn the patrol vehicle into an "interrogation cell" and render Defendant Forbes in custody under *Miranda*; rather, this initial questioning more closely detailed the routine traffic stop detailed in *Berkemer*. *See also Panak*, 552 F.3d at 466.

### 2. Statements After Being Handcuffed

The Government asserts that Defendant Forbes was under custody for *Miranda* purposes when he was handcuffed and placed in the back seat of the patrol vehicle, and thus, it will not use those voluntary statements in its case-in-chief. Ultimately, the Court agrees with this conclusion and would have found that any questioning constituted a custodial interrogation.[9]

---

[9] During the hearing, the Government also claimed that Defendant Forbes' statements allegedly providing consent—including "I got nothin' but a lot of money in there" should be admissible despite Defendant being in custody. Defendant did not include any argument on how these statements would be inadmissible. However, the Court notes that the Sixth Circuit has held that Defendant's consent to a search is a non-testimonial act that does not implicate a Defendant's Fifth Amendment rights. *See, e.g.*, *United States v. Kellogg*, 202 F. App'x 96, 103 (6th Cir. 2006); *United States v. Cooney*, 26 F. App'x 513, 523 (6th Cir. 2002).

56

However, the Government also maintains that Defendant Forbes' "spontaneous utterances about the amount of money and his interest in it are admissible because those statements were not made in response to any THP interrogation or its functional equivalent." [Doc. 347 at 2]. Defendant Forbes does not specifically address this argument but moves to suppress all statements as a result of the alleged unconstitutional search and seizure of his vehicle.

"Volunteered statements of any kind are not barred by the Fifth Amendment." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478 (1966)). Instead, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent[,]" which is "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300–01 (internal footnotes omitted). "Interrogation" refers to express questioning or words or actions on the part of the police that they know are reasonably likely to elicit an incriminating response. *McKinney v. Hoffner*, 830 F.3d 363, 370–71 (6th Cir. 2016) (quoting *Innis*, 446 U.S. at 301). Therefore, "spontaneous and unprovoked" statements are admissible. *United States v. Cole*, 315 F.3d 633, 637 (6th Cir. 2003).

As previously detailed, Defendant was placed in the back seat of the patrol vehicle at approximately 20:13:17. The Honda is subsequently searched and $13,130 is found in a plastic bag within the sealed dog food bag. At approximately 20:37:34, Defendant is instructed to exit the vehicle and an unknown item appears to be counted in front of him. At approximately 21:25:34, Trooper Fletcher asks Defendant Forbes and Codefendant Gilmore—who are both in the back seat of the patrol vehicle—whose money was in the dog food bag in order to have them sign a release form. Trooper Fletcher then informs Defendant Forbes that he was signing a form

57

releasing the money to the THP at the current time. Then, at approximately 21:30:58, while Trooper Fletcher was preparing to transport Defendant Forbes and Codefendant Gilmore to the Roane County Jail, and Defendant Forbes was placed in the back seat of the patrol vehicle, Defendant Forbes asks "Did y'all count that money?"—to which Trooper Fletcher responds "No, we don't count it." Defendant Forbes then states, "That's fourteen, one thirty, to be exact." Trooper Fletcher explains that it is taken to the bank to get an official count, and sealed on camera, to which Defendant Forbes responds "I hope you gonna' open it on camera [be]cause I don't want nothing missing from that, sir."

The Court finds that Defendant Forbes' statements in the back seat of the patrol vehicle—including "Did y'all count that money; That's fourteen, one thirty, to be exact;" and "I hope you gonna' open it on camera [be]cause I don't want nothing missing from that, sir"—were voluntary statements not made in response to interrogation. While Defendant Forbes was in custody at this time, his statements regarding the seized money were not a result of police questioning. Although Trooper Fletcher previously asked Defendant Forbes and Codefendant Gilmore who the money belonged to, Defendant Forbes' subsequent statements were several minutes after this questioning. Moreover, the Court finds that Trooper Fletcher's questioning in order to have Defendant Forbes or Codefendant Gilmore sign a release form for the found money was not the "functional equivalent" of interrogation. *Innis*, 446 U.S. at 301; *see, e.g.*, *United States v. Chalmers*, 554 F. App'x 440, 443 (6th Cir. 2014) (finding the defendant's statements were a voluntary confession where the police were transporting the defendant arrested on gun and drug charges to the police station, and the defendant overheard officers asking dispatch to run a query on the recovered gun and the defendant believed that law enforcement stated the gun was stolen and subsequently "blurt[ed] out . . . I didn't steal that gun, I paid $20 for that gun off the street, I didn't steal

nothing"); *United States v. Thompson-Bey*, No. 3:09-CR-64, 2010 WL 2711105, at *18 (E.D. Tenn. Jan. 12, 2010) (finding the defendant's statements that drugs found in a piece of luggage in a vehicle were his were not the result of police questioning, and the "officers' actions of searching the luggage within the Defendant's view and taking the clear bag into the patrol car was not the 'functional' equivalent of interrogation"), *report and recommendation adopted by*, 2010 WL 2710630 (E.D. Tenn. July 7, 2010).

Therefore, the Court finds that Defendant Forbes' statements immediately prior to being transported to the Roane County Jail were voluntary utterances not in response to any interrogation by law enforcement. Trooper Fletcher did not attempt to question Defendant Forbes in detail about the found money, other than having either Defendant Forbes or Codefendant Gilmore sign a release form. Defendant Forbes' statements were not in response to the "functional equivalent" of interrogation. *Innis*, 446 U.S. at 301. Moreover, these spontaneous statements were sufficiently attenuated from any earlier questioning. At the time of the spontaneous declarations, Trooper Fletcher was preparing to transport Defendant Forbes and Codefendant Gilmore, and thus, was not engaged in interrogation. As such, these voluntary statements are admissible in the Government's case-in-chief and will not be suppressed.

### H.   Good Faith

The Government argues that if the Court finds a constitutional violation, then suppression of the evidence is not an appropriate remedy under the good faith exception.

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000); *see also Mapp v. Ohio*, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); *Weeks v.*

*United States*, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment).  However, the exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *United States v. Herring*, 555 U.S. 135, 139-40 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).  The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," *Arizona v. Evans*, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" *Herring*, 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).  In other words, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.

However, the Court has not found a Fourth or Fifth Amendment violation, so neither the exclusionary rule, nor the good faith exception, need be applied in this case.  Therefore, the Court will not address the Government's overall good faith argument.

## V.  CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned respectfully **RECOMMENDS** that Defendant Forbes' Motion to Suppress [**Doc. 338**] be **DENIED**.[10]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[10] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).